UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff                    Case No: 20-CR-00199(LJV)

        v.

DAVID CALAIACOVO,

                              Defendant.

## DAVID CALAIACOVO'S SENTENTENCING MEMORANDUM, OBJECTIONS TO PRESENTENCE REPORT AND LETTERS IN AID OF SENTENCING

DATED:      Buffalo, New York
            July 5, 2022             Respectfully submitted,

                                     /s/Herbert L. Greenman
                                     HERBERT L. GREENMAN, ESQ.
                                     LIPSITZ GREEN SCIME CAMBRIA LLP
                                     Attorneys for Defendant
                                     David Calaiacovo
                                     Office and Post Office Address
                                     42 Delaware Avenue – Suite 120
                                     Buffalo, New York 14202
                                     (716) 849-1333
                                     hgreenman@lglaw.com

TO:   DAVID RUDROFF ESQ.
      ASSISTANT UNITED STATES ATTORNEY
      Federal Centre
      138 Delaware Avenue
      Buffalo, New York 14202

## PRELIMINARY STATEMENT

On May 10, 2021 David Calaiacovo appeared before United States District Judge Lawrence J. Vilardo, waived indictment and pled guilty to a one-count Information which charged him with conduct occurring on June 27, 2019 in the Western District of New York for Knowingly Possessing and Accessing Material Contained on Various Electronic Devices. The information alleged that some images obtained from the devices portrayed a prepubescent minor who had not attained 12 years of age and that the material had been shipped or transported in or affecting interstate and/or foreign commerce in violation of 18 USC §2252A(a)(5)(B) and 2252(A)(b)(2). Previously, a complaint had been filed against Mr. Calaiacovo.

After his arraignment before a Magistrate Judge, Mr. Calaiacovo was released to pretrial supervision on a non-financial bond.  As set forth in the presentence report, Mr. Calaiacovo was ordered to report to Pretrial Services as directed by the probation department, surrender his passport or other travel documents, and his travel has restricted to the Western District of New York.

Moreover, Mr. Calaiacovo was ordered to remain at a verifiable address, avoid all contact with any victims and/or witnesses, to submit to a mental health evaluation and/or treatment if it was found appropriate and other conditions. Mr. Calaiacovo, since the time of his arraignment in 2019, for approximately 3 years was placed under GPS electronic monitoring and was ordered to comply with any and all additional sex offender conditions including participation in computer/Internet monitoring programs, submit to mental health intervention designed for at all defendants who are charged in the Western District of New York with similar crimes and refrain from contact with any child.

On May 10, 2021 after his plea of guilty, Mr. Calaiacovo was continued released under

the conditions previously set. However, his conditions were modified to include participation in location monitoring and he was subjected to home detention with GPS monitoring. Mr. Calaiacovo was admonished that he was to have no access to any Internet capable devices and was required to sign a computer monitoring agreement prior to departing after his plea of guilty. Paragraph 16 of the presentence report indicates that there have been no further instances of any noncompliance.[1] No court intervention was requested and Mr. Calaiacovo, who was closely monitored, has incurred no further inappropriate behavior.

Because he has, for the most part, been in compliance with all of the terms of his release other than set forth below, Mr. Calaiacovo has remained in the community under limitations including home confinement and electronic monitoring. Mr. Calaiacovo has taken his release seriously and has, to counsel's knowledge with one exception, been totally compliant with all the terms of his release since August, 2020, almost 2 years ago.

### THE PLEA AGREEMENT ENTERED INTO BETWEEN MR. CALAIACOVO AND THE GOVERNMENT

As Acknowledged in the presentence report, pursuant to a written Plea Agreement entered into between Mr. Calaiacovo and United States Attorney's Office for the Western District of New York, the parties agreed that the base offense level for his crime of conviction was 18. Moreover, the parties agreed that there would be additional enhancements including a two-level increase because material involved a prepubescent minor, a 4 level increase as the offense portrayed material involving sadistic masochistic images, a two-level increase because the crime involved the use of a computer and a 5 level increase based on the fact that 600 or

---

[1] Paragraph 15 of the presentence report indicates that in August, 2020 it was learned through computer monitoring that Mr. Calaiacovo had browsed a dating and sex website. Other than that conduct for which Mr. Calaiacovo was admonished could not be repeated, there were no further issues.  During a meeting with his probation officer, Mr. Calaiacovo candidly acknowledged that the conduct was inappropriate.

more images were found on the electronic items. Coupled with a three-level downward adjustment based upon Mr. Calaiacovo's acceptance of responsibility, the parties agreed that Mr. Calaiacovo's Guideline range for imprisonment is 78 to 97 months, a fine and a period of supervised release of 5 years up to life. Moreover, Mr. Calaiacovo was well aware that he will have to register as a sex offender upon completion of his sentence and that a Special Assessment and/or Restitution would be imposed by the Court.

Finally, Mr. Calaiacovo agreed that the computer equipment set forth in the Plea Agreement would be forfeited to the government without further action by the government and that Mr. Calaiacovo would forfeit any interest in any online accounts containing any victim information.[2]

## MR. CALAIACOVO'S CRIME OF CONVICTION AS SET FORTH IN THE PRESENTENCE REPORT

The presentence report adequately sets out Mr. Calaiacovo's criminal activity. In sum and substance, he was charged and convicted for accessing and viewing images of child pornography on his computer. As noted therein, the background referenced information from NCMEC who referred the case to the New York State Police that child pornography had been located on Mr. Calaiacovo's server. As a result, on June 27, 2019 a search warrant was executed at Mr. Calaiacovo's home and a number of electronic devices were seized. A computer forensic analysis of the items indicated that a number of files containing images of children would qualify as child pornography. During the execution of the search warrant, Mr. Calaiacovo voluntarily agreed to speak with the executing agent's. Before the interview was completed, Mr. Calaiacovo admitted to his email address and possession of the images found therein. Notably, Mr.

---

[2] There is no indication that Mr. Calaiacovo, however, possesses any online accounts containing any victim information or, for that matter, any other children's information.

Calaiacovo has never denied his culpability. During his interview with the United States probation officer who prepared the presentence report, Mr. Calaiacovo was open and candid until he asserted his right to counsel. He advised that at a time around or shortly after his retirement as a school psychologist, he became involved with viewing, more often than previously, adult pornography. As is often times typical in these types of cases, Mr. Calaiacovo admitted that he progressed from viewing adult pornography to child pornography.  As he indicated, he had viewed adult pornography for approximately as long as 10 years prior to his arrest. He indicated while browsing numerous websites he came upon a number of other websites which contained child pornography for brief periods of time. In September, 2018 he became curious relative to viewing child pornography images and, as a result, he began viewing child pornography. As he indicated, he accessed child pornography by using a web browser. After entering various search terms, he advised that he was able to access child pornography images. His interest searches normally centered around children who were portrayed in "provocative ways," which he described to the officer.

As we indicate, after retiring from his position, he found that he had too much time on his hands and, in the process of recovering from hip surgery, he continued to browse and view child pornography. As we indicated, he found, for reasons that will be set forth below, that he was depressed and lonely. While the presentence report indicates that Mr. Calaiacovo stated that he was stimulated by images of children appearing to be young, in fact, during the interview, Mr. Calaiacovo advised that he was not attracted to children of a very young age but that the images were part of a larger group of images which appeared on-line. For the most part, Mr. Calaiacovo stated that his interest was mostly "upper teens," between the ages of 13 and 16.

Mr. Calaiacovo was asked how he now felt about his crime of conviction. He immediately stated to the probation officer that "the images that I viewed were disgusting."

Paragraphs 62 of the report indicated that the probation officer spent a period of time discussing whether Mr. Calaiacovo had ever attempted or used "hands-on" behavior relative to any of the victims because he had worked for many years as a school psychologist. Mr. Calaiacovo stated, unequivocally, that his criminal conduct was limited to viewing child pornography and that "he did not experience fantasies of hands-on contact with children." Furthermore, Mr. Calaiacovo denied that he had ever been engaged in hands-on contact with any child under the age of 18 years. As he stated to the probation officer "the defendant confirmed that he was not stimulated by the children that he was in contact with for the purposes of his employment".

In fact, to counsel's knowledge, various authorities conducted investigations as to whether there was any evidence that Mr. Calaiacovo had ever acted in a way attempting to have hands-on communication or activities with any child. To counsel's knowledge, the investigation determined that there was never any complaint or any indication that he had done so.

In fact, as we will discuss below, shortly after his arrest, Mr. Calaiacovo begin to counsel with a noted psychologist specializing in sexual abuse cases, Dr. David Heffler. Dr. Heffler is well known in the Western New York community. In fact, Erie County and Niagara County probation officers almost exclusively utilize Dr. Heffler's expertise. As well, the New York State Department of Parole regularly utilizes Dr. Heffler. As will be seen, and attached hereto, Dr. Heffler's Report outlines Mr. Calaiacovo's circumstances and contains a Risk Assessment of Mr. Calaiacovo.

Additionally, Dr. Heffler requested Mr. Calaiacovo to undergo a polygraph examination which dealt with the issue of whether Mr. Calaiacovo had ever had any hands-on experiences with children or whether he fantasized about having access to any children. Mr. Calaiacovo passed the polygraph examination. In fact, the polygraph examiner, whose expertise is in the area of sexual abuse and child pornography cases determined that Mr. Calaiacovo was **not deceptive**. In other words, there is not one *scintilla* of evidence that Mr. Calaiacovo ever acted in a manner specifically or actively injurious to a child by any hands on experiences. Nevertheless, Mr. Calaiacovo has fully recognized his wrongdoing in accessing and viewing child pornography. He offered a "heartfelt apology" to the probation officer. As the presentence report indicates:

> He further apologized to his daughter, his family and friends, and those associated with the West Seneca school district, for any "heart ache or embarrassment" that his behavior has caused. He acknowledged that his conduct is not a victimless crime. He remarked, "I made a very poor decision," and he indicated that he believes that his mental health treatment programs are beneficial to him as he is working to understand his behavior (PSR, par. 63).

## WHO IS DAVID CALAIACOVO

David Calaiacovo is about to turn 65 years old on July 10, 2022. For the most part, he is a defeated, lonely man. After his charges, for the most part, his family and friends have abandoned him as a result of his arrest and conviction for the instant charges. In fact, his only daughter ended their relationship once he was arrested and he has had no communication with her since then. Prior to his arrest, he and his daughter had what appeared to be a strong relationship.

Mr. Calaiacovo spends the vast majority of his time while in home incarceration by himself. With the exception of a few friends and because of his home incarceration, he has little communication with others on a face-to-face basis.

Mr. Calaiacovo is hopeful that once his case his concluded, he will be able to meet other individuals so that he will be able to at least share a casual social relationship. He understands that the stigma he currently faces as result of his conviction for possession of child pornography will inhibit his ability to experience a normal social life in the future.  However, he remains at least hopeful because he has fully come to grips with what he did and he blames only himself for his downfall.

Mr. Calaiacovo's health continues to diminish as he gets older, no doubt as a result of his depression which he faced even prior to his offense.  He has been diagnosed with anxiety and depression. Mr. Calaiacovo described a lengthy period of time where he began to experience mental health issues. He is currently involved with mental health counseling and treatment at Horizon Health Services. He is prescribed Paxil and attends group and individual counseling on a regular basis at Endeavor Health Services.

Significantly, for numerous reasons, shortly after his arrest, Mr.  Calaiacovo began group and one-on-one counseling with Dr. David Heffler which began in or about December, 2020. He also engages in "faith-based" counseling at St. Mark's Church in Orchard Park, New York.

We have attached hereto a copy of Dr. Heffler's Report which we will discuss below. Notably, Mr. Calaiacovo, a regular participant in counseling at three different health centers, actively participates in group and one-on-one counseling and will continue in counseling through his sentence. He is, in all respects, complying with his counseling, mostly because he wants to do so not simply because he is ordered. ███████████████████████████████ ███████████████████████████ For that, Mr. Calaiacovo has advised that he will continue to actively seek and continue with counseling at the appropriate time.

As noted, Mr. Calaiacovo's physical health is on the decline. He suffers from hypertension, high cholesterol and diabetes and is prescribed a plethora of medications.







## ANALYSIS

Mr. Calaiacovo has taken the long road toward his rehabilitation. His treatment regimen to date has been more than successful. (See *United States Department of Justice, Center for Sex Offender Management, Understanding Treatment for Adults and Juveniles who have Committed Sex Offenses* (2006) (["T]here is no compelling reason to conclude that specialized treatment in other rehabilitation interventions should be abandoned in favor of a sole reliance on more punitive approaches that have already been demonstrated as having very little impact on enhancing community safety"). As a consequence, we respectfully ask the Court to fashion a sentence which recognizes the seriousness of Mr. Calaiacovo's offense and would provide specific and general deterrence. However, it is significant to note Mr. Calaiacovo's age, the fact that he has no prior criminal history to speak of and has been successful in three different counseling programs since he has been placed under pretrial supervision show he is on the way to healthy thinking. As well, any conditions which will be placed post sentence upon Mr.

11

Calaiacovo will also have serious consequences. Mr. Calaiacovo will likely have restrictions where he will live, work and travel. He will be required to register as a sex offender. He will have severe restrictions on computer and Internet use and will be ordered to comply with any and all conditions imposed by the Court and/or his probation officer. See *United States v. Garate*, 543 F3d 1026, 1028- 29(8th Cir., 2008) (the court may consider the lasting effects of being required to register as a sex offender).

The United States Sentencing Guideline Commission has found that "the current sentencing scheme results in overly severe Guideline ranges based on outdated and disproportionate enhancements related to their collective behavior." (*United States Sentencing Commission, Child Pornography Report*, at 321.). As well, the United States Department of Justice has agreed with the Sentencing Commission's general conclusion that:

> "[T]he Department agrees with the Commission's conclusion that advancement and technologies in the evolution of the child pornography "market" that have led to a significantly changed landscape, one that is no longer adequately represented by the existing Sentencing Guidelines. Specifically, we agree with the Report's conclusion that the existing Specific Offense Characteristics (SOC's) and USSG §2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness. The current guidelines can at times under - represent and at times over - represent the seriousness of an offender's conduct and a danger the offender possesses.

Courts have found that as recently as 2010, in cases where USSG §2G2.2 enhancement applied, the enhancement for possessing materials depicting prepubescent minors §2G2.2(b)(2)) use of a computer §2G2.2(b)(6) ) and number of images (§2G2.2(b)(7) applied in over 95% of cases. (See *United States Sentencing Commission Child Pornography Report* at 2009). As well, the enhancement for possession of material portraying violence or sadomasochistic conduct

§2G2.2(b)(4)) applied in 74% of all §2G2.2 cases. In this case, all of the enhancements apply to Mr. Calaiacovo's conduct. They therefore may not accurately depict the severity of his offence. Here, Mr. Calaiacovo has not denied his guilt. As well, he never created, facilitated or participated in a community centered on child exploitation. In *United States v. Pelowski*, 31 F.Supp. 3rd, 952 (SD, Ohio, 2014) the court found that while the defendant had viewed child pornography for a substantial period of time, there was no suggestion that he was a member of an online community centered on child exploitation. Without doubt, we ask that Mr. Calaiacovo's post bail release rehabilitation efforts should strongly be considered by the Court not only as being admirable but helping him to understand his feelings toward his crime of conviction.

The United States Sentencing Commission has found that expert treatment has the effect to reduce the recidivism risk of child pornography offenders over their lifetimes. (Report, 293, 298- 309. As well, as in *Polowski, supra* Mr. Calaiacovo is a good candidate for rehabilitation which reduces the likelihood of committing any future crimes. He has never physically abused any child and it is unlikely that he ever would in the future. He has also been found to be a low level risk for committing any contact offense or, for that matter, reoffending at all including child pornography offenses.

In the end, in imposing a sentence, the Court will consider the factors set forth in §3553(a) and, after considering the factors, the Court will impose a sentence that is sufficient, but not greater than necessary, to satisfy the purpose of sentencing: just punishment, respect for the law, deterrence, protection of the public, and rehabilitation of the defendant. The Court should not presume the Guideline range is the correct one within which the defendant should be sentenced. See *Newton v. United States*, 555 US 350, 352 (2009); *Rita v. United States*, 551 US

338, 351 (2007). Here, counsel is prohibited from advocating for sentence lower than the anticipated Guideline range.

It is recognized that long terms of imprisonment for non-acting-out offenders have been strongly attacked as unsound, overly harsh and fundamentally deviating from the Guidelines' overarching policy and expertise. *United States v. Dorvee*, 616 F3d 174 (2d Cir., 2010); *United States v. Grover*, 624 F3d 592, 609 (3d Cir., 2010); *United States v. Stone*, 595 F3d 83, 97 (1st Cir., 2009); *United States v. Huyck*, 2015 WL6142929 (D.C., Nebraska, 2015).

Here, there is no showing that Mr. Calaiacovo was involved with file sharing or peer to peer arrangements with other individuals. Indeed, there is no showing that he possessed child pornography in order to entice a child for sex or to trade or distribute images, nor did he have any improper contact with children. Those factors should be considered as to what sentence should be imposed. In *United States v. Huyck, supra* the Court found:

> The Guidelines' sentencing scheme for child pornography crimes logically skews sentences for "average" defendants to the upper end of the statutory range, regardless of the particular defendant's acceptance of responsibility, criminal history, specific conduct or degree of culpability, thus blurring distinctions between the least culpable and the worst offenders. In the context of this and other Internet child pornography crimes that involve peer-to-peer networks, the Guidelines provide little distinction between a low-level distributor and a high-level distributor and no distinction between one who merely possesses and those who "receive," as opposed to "distribute." In this Court's experience, there is essentially no Internet child pornography offender who could end up with a Guidelines recommended sentence that falls at or close to the low end of the statutory range for either a possession or receipt offense.

The court also found that the number of images themselves do not provide a distinction between a large-scale and small-scale child pornography purveyor that Congress in the Sentencing Commission must have envisioned when promulgating the market-based and

14

quantity-driven scheme. In *United States v. Monge*, 2015 WL 787099 (C. D. California, 2015) the court found that the size of an individual's child pornography collection was largely irrelevant to the sentence to be imposed.

Most recently in *United States v. Jenkins*, 854 F3d 181 (2d Cir., 2017), the Second Circuit has again paid attention to what it references as "disproportionate enhancements" under USSG §2G2.2. The court reemphasized prior decision in *United States v. Dorvee, supra*, finding that:

> Our conclusion that *Jenkin's*, sentence was shockingly high as reinforced by the important advances and our understanding of non-production of child pornography offenses since we decided *Dorvee*. To begin with, the latest statistics on the application of sentencing enhancements confirmed that the enhancement Jenkins received under this Guidelines are all-but-inherent. In 2014 for example, 95.9% of defendants under section §2G 2.2 receive the enhancement for an image of a victim under the age of 12, 84.5% of sadistic or masochistic conduct or other forms of violence, 79.3% for an offense involving 600 or more images, and 95% for the use of a computer. See U. S. Sentencing Commission, Use of Guidelines and specific offense characteristics (<u>offender based</u>, Fiscal Year were 2014, 42-43 available at <u>www.ussc.gov/sites/default/files/pdf/resurf/and/publications/federal/sentencing/statistics/guidelines/publication/frequency/2014/</u>.
>
> Since *Dorvee*, the Sentencing Commission has also produced a comprehensive report to Congress examining §2G2.2. U.S. Sentencing Commission Report to Congress: Federal Child Pornography Offenses (2012). Hereinafter §USSC Report", available at <u>www.USSC.gov./sites/default/files/pdf/new/congressional-testimony-and-reports/sex-offense topics/2012</u>. In this report, the Commission explained that it "believes that a current nonproduction Guideline warrants revision in view of its outdated and disproportionate enhancements related to offender's collecting behaviors while as its failure to account fully for some offenders' involvement in child pornography communities and sexually dangerous behavior." Since the Commission has effectively disavowed §2G2.2, it should be clearer to a district court and when we decided *Dorvee* that this Guideline "can easily generate unreasonable results." 616F. 3rd at 188.

While we are unable to ask for a non-Guideline sentence, we ask the Court to consider all of the foregoing. As the Court knows, the sentencing Guidelines are not mandatory *Currencies v. United States*, 552 US 38 (2007)) and they can act as a Guideline or a starting point for the court in making an appropriate decision. *United States v. Dorvee, supra*, 616 F3d 174 (2d Cir., 2010), (where the court noted that under §3553(a)'s Parsimony Clause a sentencing Court's duty is to impose a sentence sufficient but not greater than necessary to comply with a specific purpose as set forth in the statute).

Generally speaking, the Second Circuit has shown a rejection for <u>carte blanche</u> acceptance of the Guidelines in child pornography cases. (*Dorvee*).:

> The District Court was working with the Guideline that is fundamentally different from most, in that unless applied with great care can lead to unreasonable sentences that are inconsistent with what §3553 requires. Sentencing Guidelines are typically developed by a Sentencing Commission using an empirical approach based on data about past sentencing practices. However, the Commission did not use an empirical approach in formulating the Guidelines for child pornography. At the direction of Congress, the Sentencing Commission has amended the Guidelines under §2G2.2 several times since their introduction in 1987 each time recommending harsher penalties.

The court in *Dorvee* found that the enhancements under §2G2.2 "cobbled together through this process routinely resulting in Guidelines projections near or approaching the statutory maximum even in run-of-the-mill cases." The court noted:

> Consequently, adherence to the Guidelines resulted in virtually no distinction between the sentences where defendants like Dorvee and the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and to fall into higher Criminal History Categories. This result is fundamentally incompatible with §3553(a). By concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirements of §3553(a) that district courts consider "the nature and circumstances of the offense and the history and

16

characteristics of the defendant" in violating the principle in *Gall*, that courts must guard against unwarranted dissimilarities among sentences for defendants who have been found guilty of dissimilar conduct.

Of course, appellate courts have encouraged sentencing courts to take seriously the broad discretion those courts possess while fashioning a sentence under §2G 2.2 ranges which may be eccentric. The court noted that sentences may range from non-custodial sentences to statutory maximum – "bearing in mind that they are dealing with an eccentric Guideline of highly unusual providence which, unless carefully applied can easily generate unreasonable results." *United States v. Bourque*, 2013 WL 1352473 (2d Cir., 2013) (unreported); *United States v. Oehne*, 698 F3d 119, 126 (2d Cir., 2012) (*Dorvee* advised district courts to exercise caution in imposing sentences for child pornography offenses at or near the statutory maximum even in run-of-the-mill cases.

Many courts have suggested that a sentencing court in child pornography cases should first consider whether the defendant poses a high risk or threat to any children who had physical contact with them, has committed to continue sexual offender therapy, was neither a pedophile, sexual predator or child abuser and presents a low risk of reoffending (as here) which should be considered when imposing an appropriate sentence. We believe that with the proper guidance and continued counseling, Mr. Calaiacovo does not pose a threat to children or anyone else in the community. He has advised counsel and the probation department as well as Dr. Heffler that he is and will be committed to continued sexual offender/mental health treatment. In other words he poses a low risk, if any, of reoffending. *United States v. Grinbergs*, 2008 WL 40191145(D. Nebraska, 2008) (unreported).

The §3553(a) mandates that this Court, no doubt, will consider include Mr. Calaiacovo's history and personal characteristics. He has fully accepted responsibility, he has continued to

engage in post-offense rehabilitation, he would likely be accepted into the Bureau of Prisons Sex Offense Program once the sentence reaches approximately 8 months and he will continue mental health and sex offender treatment once he is released from prison. As well, a significant period of supervised release and a requirement that he register as a sex offender should impact on any sentence the Court will impose. *United States v. Autry*, 555 F3d 864, 875-76 (9th Cir., 2009). (a defendant's sentence includes his registration as a sex offender, travel restrictions, Internet restrictions, therapy requirements, computer restrictions and other negative consequences).

As can be seen from the documents attached hereto, Mr. Calaiacovo had previously led a good and appropriate life. His professional life was dedicated to helping young children in need of mental health help. He did that with aplomb. Mr. Calaiacovo always did what was required and more as a psychologist with the school system. He worked for many years and always received the highest and best reviews. He was dedicated to the lives of the children he helped.

Undoubtedly, it is difficult to understand why a person who helped so many children would have watched them at the worst time of their lives. Mr. Calaiacovo recognizes what he did, that it was wrong and that while indirectly, he caused damage to the children who were involved. In that, he will be eternally sorry.

As well, Mr. Calaiacovo's own letter helps to establish who he is today as opposed to previously. He has shown incredible remorse for his crime of conviction and thinks about what he has done every day. In many ways, his life has been shattered, but only because of his own selective acts. He knows that and blames no one but himself. To say the least, he is sorry for what he is done.  We know firsthand the sorrow and empathy he shows for the children whose trust he violated.

## LETTERS IN AID OF SENTENCING

Attached hereto are numerous letters which we have received on Mr. Calaiacovo's behalf and background information as to his previous employment. We ask the Court to consider the letters in the light in which they are intended.

## CONCLUSION

There can be little or no doubt that Mr. Calaiacovo has fully accepted responsibility for his actions. He recognizes that he not only hurt his family and community but more importantly the children whose images he viewed. Indeed, Mr. Calaiacovo has fully accepted responsibility and has acknowledged the pain he has caused. He understands that while his victimization of the children was "indirect," nonetheless it was harmful to them. In many ways, he struggles with his own conduct which he knows was disgusting.

It is more than difficult to understand why a devoted therapist and teacher of such great distinction could only be defined by the crime that he committed. But he will be for the rest of his life. As he has mentioned, the images are not only disgusting they are tragic. Children's lives have been lost at the hands of others. Mr. Calaiacovo did not help the situation by accessing the material.

While it is difficult to understand how Mr. Calaiacovo became involved in viewing child pornography, it is no doubt from a direct tie to his own depression. Dr. Heffler has done his best to portray all of the circumstances of Mr. Calaiacovo's life and mental health issues to the Court. What we have learned, however, is that there is no final answer. We know that he has begun and continued his treatment for a long period of time and we earnestly believe that he will live a life in the future free from any suggestion that he has, in any way, harmed any child.

It may be said that Mr. Calaiacovo's life in his community and with his family are irreconcilable with his crime of conviction. But they are. It is difficult to understand why such an otherwise good person like Mr. Calaiacovo could have done such a horrible thing.

The words from Mr. Calaiacovo are important for the Court to consider. These are words from an individual charged with child pornography offenses and who is about to be sentenced. They are not always seen. Mr. Calaiacovo understands the full scope of his crime. He simply wants the Court to understand how sorry he is for what he has done. We believe that in all respects his sorrow is sincere.

By this memorandum we are not attempting in any way to try to minimize the seriousness of Mr. Calaiacovo's crime of conviction. We fully understand that his conduct will never be condoned. We hope, however, that Mr. Calaiacovo's own personal life, which had previously been well spent, will not be forgotten in the sentencing process. We understand how complicated this case is. A sentence to be imposed by the Court, especially upon a man who has done so many good deeds in the past, could never be an easy task.

Because of his age, Mr. Calaiacovo's chances of reoffending are significantly less than other younger individuals. The Sentencing Commission has found that Mr. Calaiacovo is among the lowest classes of risk to reoffend. (See, the effects of aging on recidivism among Federal offenders, United States Sentencing Guidelines Commission. www.ussc.gov/sites/default/file/pdf/research/and/publications/research/publication/2017/201712 07recidivism/age.pdf. Mr. Calaiacovo has done everything that he could do to acknowledge his guilt and wrongdoing. He has hurt the children, as well as his own family by letting them down. He is now isolated from most of his friends and relationships. That is terribly sad but, unfortunately today, a never ending reality.

That being said, however, in many ways his criminal conduct was an anomaly from an otherwise law-abiding life. We hope that all of the good that he has done in his life will not be ignored. Indeed, we trust that it will not.

Consequently, we respectfully request that this Court impose a sentence consistent with the Sentencing Memorandum.

## OBJECTIONS TO PRESENTENCE REPORT

There are a number of minor revisions which we ask from the presentence report.

Paragraph 112 - Mr. Fawcett has advised that he attempted to call the probation officer but did not hear back.

Paragraph 114 - Mr. Calaiacovo's mother died at age 80. Her disease was diagnosed at 65 years of age.

Paragraph 115 – Mr. Calaiacovo's brother Mark is a retired kindergarten teacher.

Paragraph 116 – Mr. Calaiacovo advised that while living in Orchard Park he was often bullied with derogatory anti-Italian words used toward him and his family.

Paragraph 118 – Mr. Calaiacovo advised that prior to his arrest he and his daughter had a loving, nurturing relationship. Mr. Calaiacovo also noted that after his arrest, the loss of his daughter has been devastating to him.



Paragraph 130 - Mr. Calaiacovo transferred to the State University of New York at Buffalo in 1977 where he earned his Bachelor's Degree in Psychology in 1980.

Paragraph 30 - 1997 should be 1977.

Paragraph 131 - Mr. Calaiacovo's evaluations from his supervisors show that he had the highest character in professionalism.

Paragraph 134 - The federal tax lien which was filed was withdrawn when it was determined that it showed no validity.

Paragraph 3 - Mr. Calaiacovo did not solicit infants or toddlers. When he accessed child pornography those images were included in a larger group of images which he subsequently received.

WHEREFORE, your deponent prays that this Court sentence Mr. Caliacovo accordingly.

/s/Herbert L. Greenman
HERBERT L. GREENMAN, ESQ.